UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | Chapter 7 |
| | : | |
| DEBBIE ESOLA, | : | |
| | : | Bankruptcy No. 18-17737-AMC |
| DEBTOR | : | |
| | : | |
| PHILADELPHIA GAS WORKS, | : | |
| | : | |
| PLAINTIFF | : | |
| | : | Adv. Proc. No. 19-00015-AMC |
| v. | : | |
| | : | |
| DEBBIE ESOLA, | : | |
| | : | |
| DEFENDANT | : | |

Ashely M. Chan, United States Bankruptcy Judge

# OPINION

## I.  INTRODUCTION

In this adversary proceeding, Philadelphia Gas Works ("PGW"), a municipally owned gas utility in Philadelphia, seeks to have this Court determine that the $8,982.03 unsecured obligation owed to PGW by Debbie Esola ("Debtor"), on account of unbilled gas usage at her residence, is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), or 523(a)(6). Because the Court finds that the Debtor fraudulently intended to misappropriate gas from PGW that was worth $8,982.03, the Court concludes that such debt arose from larceny and, therefore, is nondischargeable pursuant to § 523(a)(4).

1

## II.   FACTUAL FINDINGS AND PROCEDURAL HISTORY

Upon consideration of the testimony and evidence presented at trial, the Court makes the following findings of fact. Prior to filing for bankruptcy, the Debtor had rented a property at 2625 S. Darien Street, Philadelphia, Pennsylvania ("Darien Street Property") where, initially, gas payments were included in her rent. PGW Ex. 14; Trial Tr. 93:16-17, 96:24-97:2, 98:14-17, Oct. 18, 2019 ("Trial Tr."). Because gas payments were included in her rent, she did not receive any gas bills directly. Trial Tr. 94:20-95:3. At some point during her tenancy at the Darien Street Property, the landlord informed her that her rent would no longer include gas. *Id.* at 95:1-3, 98:18-20. At that point, she called PGW to have gas service put into her name and began receiving PGW bills. *Id.* at 95:1-3, 98:21-99:3.

Before the Debtor entered into a lease at 2537 S. 8th Street, Philadelphia, Pennsylvania ("Property"), the Property was occupied by tenant John Lejko ("Tenant"). PGW Ex. 10; Trial Tr. 90:14-22. On May 6, 2010, PGW terminated gas service at the Property on account of Tenant's non-payment. Pre-Trial St. ¶ 8; PGW Ex. 4, 5; Trial Tr. 32:22-33:4, 112:8-12. Terminating gas service involves a PGW technician shutting off the gas meter valve and locking the valve in the off position with a "bike lock." Trial Tr. 26:4-6, 32:18-34:1.

Separately, on November 1, 2011, the Philadelphia Department of Licenses and Inspections issued a violation against the Property finding that the Tenant had been stealing electric service, creating a hazard for the entire block. Ex. D-1; Trial Tr. 60:2-14. The Property's owner had the electrical hazard fixed. Ex. D-1; Trial Tr. 61:2-6. Ultimately, the Tenant was evicted in 2011. Trial Tr. 90:14-22.

In February 2012, the Debtor entered into a residential lease for the Property with a rental term beginning April 1, 2012. PGW Ex. 11 p. 1. She had to initial every page of the lease, which

2

clearly states on page three that she is responsible for paying for gas and electric service. *Id.* at p. 3.

Although the Debtor's lease term for the Property began in April 2012, the lease states that she would not move in until May 15, 2012. *Id.* She was unable to take immediate possession of the Property because the Tenant had stolen pipes and damaged the Property, rendering repairs necessary before she could begin her occupancy. Trial Tr. 87:4-12. After the repairs were completed, the Debtor spent the spring and summer of 2012 moving her belongings into the Property. *Id.* at 87:15-17, 108:10-21. At the time she began moving her belongings into the Property, the gas service at the Property was already turned on, despite PGW's 2010 termination. *Id.* at 87:23-24.

At some point after the Debtor began moving her belongings into the Property, the Debtor called PECO to set up an account for electrical service in her name. *Id.* at 88:4-6. On July 9, 2012, the Debtor also called PGW to set up an account in her name. PGW Ex. 6; Pre-Trial St. ¶ 21. Because PGW's records indicated gas service had been terminated at the Property in 2010, PGW would require a technician to come out to the Property to restore gas service. PGW Ex. 5, 6; Trial Tr. 50:5-51:7. The PGW customer contact record from that call reflects that the Debtor told the PGW customer service representative that she would call back later to schedule the service appointment. PGW Ex. 6. However, the Debtor never called back to make this appointment. Pre-Trial St. ¶ 21. Around October 2012, the Debtor began residing in the Property full time. Trial Tr. 87:4-6, 96:1-5, 97:19-23.

Later, on March 4, 2016, after the Debtor had resided continuously at the Property for almost four years, a PGW technician visited the Property in response to an unbilled usage tip. *Id.* at 5:24-6:1, 55:18-56:2; PGW Ex. 7. The technician was unable to gain access and posted a

3

"Meter Access Notice" to the Property which provides a phone number for the occupant to call to schedule a time for PGW to return. Trial Tr. 56:4-17; PGW Ex. 7. The Debtor never responded to the Meter Access Notice. Trial Tr. 56:24-57:1.

Ultimately, on October 26, 2018, PGW went to the Property to "abandon" gas service. PGW Ex. 8; Pre-Trial St. ¶¶ 9, 11. The abandonment process involves PGW technicians digging down to the gas main and disconnecting the gas pipe leading to the property from the gas main. Pre-Trial St. ¶ 10. While PGW was in the process of abandoning gas service, the Debtor ran out of the Property to ask what was going on. Trial Tr. 96:8-12, 113:12-13, 115:3-5, 120:8-9. She was told that gas service at the Property was being abandoned and that she needed to call PGW to restore service. *Id.* at 96:11-16, 113:12-13, 115:5-6, 120:9. The Debtor thereafter called PGW to set up an account in her name and restore service. PGW Ex. 3, 15; Pre-Trial St. ¶ 12.

Notably, the Debtor never called her landlord to ask about the abandonment of gas service, nor did she ever challenge the abandonment of service while on the call with PGW. Ex. 15; Trial Tr. 114:6-115:3, 115:10-116:2, 117:13-16. Instead, the Debtor simply asked for service to be restored. *See* PGW Ex. 15. In response to questioning by the PGW customer service representative for a required credit check, the Debtor stated that she had not had an account with PGW for years, she was a tenant at the Property, and her lease had started on "October 1." *Id.* However, the Experian credit check flagged that the Debtor had been "linked" to the Property since June 2012, not October of 2018. PGW Ex. 3, 14, 15; Pre-Trial St. ¶ 13. During the call, the customer service representative also told the Debtor that PGW had been conducting an unbilled usage investigation of the Property. PGW Ex. 15; Trial Tr. 14:18-21.

As a result of the call, PGW's Revenue Protection Unit ("RPU") was alerted to the Debtor's request for service and the possibility of gas theft at the Property. Pre-Trial St. ¶ 14;

4

Trial Tr. 32:3-9. In response, the RPU scheduled a safety check/unbilled usage investigation for October 31, 2018. Pre-Trial St. ¶ 16.

On October 31, 2018, a PGW field service technician visited the Property and discovered that (1) the bike lock used to lock the meter valve in the closed position in 2010 was missing; (2) the meter valve was turned to the "on" position; (3) there was a significant amount of natural gas in the fuel line, indicating that gas usage had occurred recently; and (4) the Electronic Reading and Transmitting ("ERT") device, known as the "ERT head," which actually tracks gas usage, had been removed, causing it to cease recording and transmitting gas usage.[1] PGW Ex. 1, 2; Pre-Trial St. ¶ 17; Trial Tr. 24:8-20, 25:13-17, 26:4-17, 29:3-8, 37:15-39:8.

In fact, during numerous remote checks on the Property's ERT device by PGW between the time that the gas was shut off in 2010 and the technician's visit, the ERT device never reflected any change in gas usage at the Property. PGW Ex. 5, 13; Trial Tr. 41:20-45:4. Thus, PGW did not know until the technician's visit that gas was actually being illegally consumed at the Property. Pre-Trial St. ¶ 20; PGW Ex. 1, 2; Trial Tr. 40:8-15. Illegal gas usage not only damages PGW, but it presents a safety hazard to everyone living in that vicinity. Trial Tr. 61:16-23, 157:5-21; Pre-Trial St. ¶ 11. All of the foregoing led PGW to conclude that, after PGW had terminated service in 2010, someone broke the bike lock, turned on the gas, and simultaneously removed the ERT head so that PGW could not detect that gas was being used at the Property. PGW Ex. 1, 2; Pre-Trial St. ¶ 19. PGW also concluded that the Debtor had consumed PGW's gas without authorization or payment since 2012. Pre-Trial St. ¶ 17; PGW Ex. 2; Trial Tr. 31:3-7.

---

[1] One of PGW's RPU field supervisors testified at trial that bike locks are routinely and easily broken using tools like wrenches, grinders, screwdrivers, and bolt cutters. Trial Tr. 37:11-14, 39:5-15, 49:13-20. He further explained that there are videos and phone applications showing people how to restore gas service undetected. *Id.* at 48:18-49:12.

5

Based upon the foregoing, PGW removed the gas meter the same day as the unbilled usage/safety check visit. Pre-Trial St. ¶ 18.

As a result of PGW's discovery of Debtor's consumption of unauthorized and unmetered gas, PGW informed the Debtor on November 6, 2018 that, in order to restore gas service to the Property, she would have to pay $8,982.03 on account of the amount of gas consumed from June 2012-October 2018, calculated based on historical gas usage at the Property.[2] Pre-Trial St. ¶¶ 22, 23, 24; PGW Ex. 9, 12. Shortly thereafter, on November 24, 2018, the Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code. Pre-Trial St. ¶ 6.

On January 16, 2019, PGW initiated this adversary proceeding seeking to have the $8,982.03 ("Debt") deemed nondischargeable. Compl. ¶ 4. Trial was held and concluded on October 18, 2019. At trial, the Debtor testified that she did not remember calling PGW in 2012 to initially set up service but did not doubt that she had done so. Trial Tr. 87:25-88:2, 100:10-12. She also testified that she did not remember why she did not call PGW back to schedule an appointment to have the gas service turned back on. *Id.* at 94:2-3, 100:16-18.

The Debtor testified that, at the time she began moving into the Property in 2012, there was gas service at the Property and that she thought that gas service was included in her rent and that her landlord had been paying the gas bills for the Property. *Id.* at 87:18-24, 93:11-16. However, the Debtor admitted that she never contacted her landlord in connection with PGW's abandonment of gas service at the Property. *Id.* at 117:13-16. In addition, during her call to PGW on October 26, 2018, she never questioned why the gas service to the Property was being

---

[2] The Debtor stipulates that she has resided continuously at the Property from 2012 to the present and does not contest that the $8,928.03 amount charged on account of her unauthorized usage is correct. Trial Tr. 5:24-6:1, 75:5-8.

6

abandoned or express that she thought her landlord was responsible for paying for her gas service. *Id.* at 114:7-24, 115:13-116:2; Ex. 15.

Although there was some question initially about whether the Debtor was the person responsible for breaking the bike lock, turning the gas service on, and removing the ERT head, the Debtor credibly testified that gas service was already turned on at the Property when she began moving in and that she does not own or know how to use the tools that would be necessary to modify the gas meter. Trial Tr. 87:18-24, 90:23-91:21. In addition, based upon the evidence submitted about the prior Tenant, it appears far more likely that the Tenant initially tampered with the gas meter, not the Debtor. *See* Ex. D-1; Trial Tr. 32:22-33:4, 60:2-14, 90:14-22, 112:8-9.

After the presentation of testimony and evidence by both parties, the matter was taken under advisement and is now ripe for decision.

### III.  DISCUSSION

PGW argues that, because the Debt to PGW was incurred as a result of fraudulent gas usage, it is nondischargeable pursuant to §§ 523(a)(2), 523(a)(4), or 523(a)(6). The Debtor, on the other hand, argues that, because she was unaware that her gas usage was unauthorized, the Debt is dischargeable.

Ultimately, the Court concludes that, although it does not appear that the Debtor initially tampered with the gas meter, she knowingly used PGW's gas without its authorization for six years and, by doing so, fraudulently intended to deprive PGW of its gas without payment. Therefore, the Court finds the Debt owed to PGW arose from larceny and is nondischargeable pursuant to § 523(a)(4).

7

### A. 11 U.S.C. § 523(a)(4)

Pursuant to § 523(a)(4), "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The plaintiff-creditor objecting to discharge bears the burden of demonstrating the debt is nondischargeable by a preponderance of the evidence. *Gaussa v. Crawford (In re Crawford)*, 476 B.R. 890, 894-95 (Bankr. W.D. Pa. 2012). PGW's complaint is based, *inter alia*, upon the larceny prong of 11 U.S.C. § 523(a)(4). Pre-Trial Memo Pt. II(2).

A finding of nondischargeability based on larceny does not require proof of a fiduciary relationship between the debtor and the creditor. *NWI Orthodontics, P.C. v. Bell (In re Bell)*, 498 B.R. 463, 477 (Bankr. E.D. Pa. 2013). It simply requires proof that the debtor committed larceny as that term is defined under federal common law. *Id.* Under federal common law, larceny is defined as "the unlawful taking and carrying away of someone else's property with the intent to deprive the possessor of it permanently." *DirecTV, Inc. v. Figler (In re Figler)*, 407 B.R. 181, 193 (Bankr. W.D. Pa. 2009). Accordingly, to establish a debt is nondischargeable for larceny under 11 U.S.C. § 523(a)(4), the plaintiff must show that (1) the debtor misappropriated services for his or her own benefit and (2) that he or she did so with fraudulent intent. *Id.* Fraudulent intent can be inferred from the circumstances. *Id.*

### B. The Debtor Misappropriated Gas Service for Her Benefit Intending to Deprive PGW of Compensation.

Based upon the testimony and evidence presented at trial, PGW has satisfied its burden to show that the Debtor fraudulently intended to misappropriate gas services for her own benefit. Although the Court finds that the prior Tenant initially tampered with the gas meter, it is clear that the Debtor understood by July 2012 that her gas usage was unauthorized and nevertheless

continued using PGW's gas without paying for it for six years, thereby misappropriating the gas services for her own purposes. The Court easily infers that she did so with fraudulent intent.

First, the Court finds that the Debtor knew that she was responsible for gas service when she called PGW in July 2012. During her previous rental at the Darien Street Property, gas initially was included in the Debtor's rent and she only called PGW later to get an account in her name *after* the landlord informed her that rent would no longer cover gas. Thus, the Debtor knew that, if she was responsible for gas service, she had to call PGW to get gas service in her name. At trial, the Debtor failed to explain why she would have called PGW in July 2012 to set up an account in her name, if she truly believed that gas was included in her rent. Furthermore, the section of her lease stating that she is responsible for electrical service is the same section stating that she is responsible for gas service. The fact that the Debtor called both PECO and PGW to set up service in her own name demonstrates that she knew that she was responsible for these services.

In addition, the Debtor must have immediately realized that her gas usage was unauthorized when she called PGW in July 2012, because PGW would have told her that the gas service needed to be turned on at the Property and that she had to schedule an appointment to restore gas service. At that point, despite the fact that PGW's records indicated that gas service had been shut off at the Property, the Debtor knew that gas service was not actually turned off at the Property and that she was receiving gas that was undetected by PGW. Rather than disclose to PGW that its records were incorrect and that her gas was already on, the Debtor said nothing to PGW, declined to make a service appointment, and never followed up with PGW to make a service appointment. The Court finds that, at that point, the Debtor knew that she was misappropriating PGW's gas and, by failing to say something to PGW and not following up with

9

PGW to make a service appointment, the Debtor fraudulently intended to misappropriate PGW's gas so that she would not have to pay for the gas that she was illegally using.

Moreover, at trial, the Debtor failed to offer any explanation, let alone a plausible one, for her failure to follow up with PGW to schedule a service appointment after she initially called in July 2012. The Court similarly infers fraudulent intent from the fact that the Debtor never contacted PGW in response to the Meter Access Notice posted to the Property in 2016. Rather than call PGW to allow inspection of the meter, she ignored the notice in the hope that her illegal gas usage would not be discovered.

Finally, the Debtor's conduct in connection with PGW's abandonment of gas service at the Property in October 2018 further demonstrates that she fraudulently intended to misappropriate PGW's gas. Although the Debtor testified that she thought her landlord was responsible for paying for gas at the Property, the Debtor admitted at trial that, after she discovered that PGW was abandoning gas service at the Property on October 26, 2018, she <u>never</u> reached out to her landlord for an explanation. She also failed to mention on her October 2018 call to PGW that she thought that her landlord was responsible for paying the gas bills at the Property. Nor did she ever ask PGW during the call why it was abandoning gas service at the Property or challenge PGW's abandonment of gas service. Instead, she did not appear to be surprised at all that gas service was being abandoned at the Property, presumably because she knew that she had been misappropriating gas for six years without paying for it. Moreover, during the call, the Debtor gave the customer service representative the false impression that her lease had just started at the beginning of October when, of course, she had resided at the Property for six years. This evasion further confirms that the Debtor fraudulently intended to misappropriate PGW's gas by trying to mislead PGW from discovering how long she had

actually lived at the Property in order to avoid paying for all the unauthorized gas she had consumed over the years.

Based upon the foregoing, the Court concludes that, by July 2012, the Debtor knew that she was receiving gas illegally and, nevertheless, knowingly and fraudulently continued to use the stolen gas to her benefit without paying PGW. As a result, the Court finds that the Debt arose from larceny and, therefore, is nondischargeable pursuant to § 523(a)(4).

### IV. CONCLUSION

For all the reasons stated, the Court holds that the Debt owed to PGW in the amount of $8,982.03 is nondischargeable[3] under 11 U.S.C. § 523(a)(4).

Date: October 29, 2019

Honorable Ashely M. Chan
United States Bankruptcy Judge

---

[3] The Debtor did not contest that $8,982.03 is the correct amount attributable to her unauthorized gas usage nor did she ever argue that less than the full amount of the Debt would be nondischargeable in the event the Court concluded that grounds for nondischargeability existed under § 523. *See* Trial Tr. 75:5-8.

11